CLERK'S OFFICE
A TRUE COPY
Jun 15, 2020
s/ Jeremy Heacox
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

### for the

### Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>information associated with the Facebook User ID<br>100005159586637 (Facebook Profile: "Taytown Wudaegang"),<br>that is stored at premises controlled by Facebook | )<br>)<br>)<br>)<br>)<br>)    Case No. **20-M-317 (SCD)** |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A. This court has authority to issue this warrant under 18 U.S.C. §§ 2703(c)(1)(A) and 2711(3)(A).

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 844(i), 844(n), and 2<br>26 U.S.C. 5861(c), 5845(a),<br>and 5845(f) | attempted arson of property used in and affecting interstate commerce,<br>conspiracy to commit arson, possession of a destructive device made in violation<br>of the National Firearms Act, and aiding and abetting those crimes |

The application is based on these facts:

See the attached affidavit.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under
18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Luke Barker, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____telephone_____ *(specify reliable electronic means).*

Date: _____6-15-20_____

_____
*Judge's signature*

City and state: Milwaukee, Wisconsin

Stephen C. Dries, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT**

I, Luke Barker, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user ID.

2.     I am a Special Agent of the U.S. Department of Justice's Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), currently assigned to the Milwaukee Field Office. I have been so employed since November 2015. My duties as a Special Agent with the ATF include investigating alleged violations of the federal firearms, explosives, and arson statutes.

3.     I have completed approximately 26 weeks of training at the Federal Law Enforcement Training Center in Glynco, Georgia. I have also completed training at the ATF National Academy. That training included various legal courses related to constitutional law, search and seizure authority, and specific training on explosives and arson investigations. Additionally, I have received training on how to conduct various tasks associated with criminal investigations, such as interviewing, surveillance, and evidence collection.

4.     As a Special Agent with the ATF, I have responded to numerous fire scenes and been involved in multiple arson investigations. I have also received additional fire investigation

training, including training at the Wisconsin International Association of Arson Investigators' 2019 annual conference. Before joining the ATF, I served for nearly eight years as a police officer with the Aurora Police Department in Aurora, Colorado.

5.      I have participated in multiple arson investigations that involved the seizure of computers, cellular phones, cameras, and other digital storage devices, and the subsequent analysis of electronic data stored within these devices. On many occasions, this electronic data has provided evidence of the crimes under investigation and corroborated information already known or suspected by law enforcement. During the course of my investigations, I have regularly used data forensically extracted from cellular devices to obtain evidence relating to the commission of criminal offenses, including identity, intent, motive, manner, and means.

6.      I have also conducted criminal investigations where records and information associated with a target or subject's social media profiles have provided evidence of the crimes under investigation and corroborated information already known or suspected by law enforcement. During the course of my investigations, I have used records and information from social media platforms to obtain public and private communications about criminal activity, incriminating photographs, information about a target's location or whereabouts, and information about the relationship amongst targets, subjects, and witnesses. I know through experience that many social media users often use social media platforms as a primary means of communication.

7.      On June 4, 2020, a criminal complaint and arrest warrant were issued charging defendant Tyshaun T. Smith (DOB: XX/XX/1994) with attempted arson of property used in and affecting interstate commerce, in violation of Title 18, United States Code, Section 844(i), and possession of a firearm, a destructive device, made in violation of the National Firearms Act (NFA), in violation of Title 26, United States Code, Sections 5861(c), 5845(a), and 5845(f),

2

occurring on Sunday, May 31, 2020, at the Boost Mobile store, located at 949 North 27th Street, Milwaukee, Wisconsin 53208.

8.	The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

9.	Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of attempted arson of property used in and affecting interstate commerce, in violation of Title 18, United States Code, Section 844(i), possession of a firearm, a destructive device, made in violation of the National Firearms Act (NFA), in violation of Title 26, United States Code, Sections 5861(c), 5845(a), and 5845(f), conspiracy to commit arson, in violation of Title 18, United States Code, Sections 844(n) and 844(i), and evidence of aiding and abetting those crimes, in violation of Title 18, United States Code, Section 2, have been committed by Tyshaun T. Smith and unknown persons. There is also probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

## PROBABLE CAUSE

10.	In conjunction with other federal, state, and local law enforcement officers, I am conducting an investigation into an arson that occurred on Sunday, May 31, 2020, at the Boost Mobile store, located at 949 North 27th Street, Milwaukee, Wisconsin 53208. At the time, the Boost Mobile store was a commercial property used in and affecting interstate commerce.

11.	At about 11:03 p.m. that night, officers of the Milwaukee Police Department were dispatched to a 911 call for an entry at the Boost Mobile store. The storeowner had called 911 to

3

report that he was remotely watching, via video surveillance, a person break the glass window of his store and people trying to get through the metal gates.

12.     Several minutes later, Officer Yang Lee arrived in a marked police car and observed three people standing next to a broken window outside of the Boost Mobile store. He observed a man, later identified as Tyshaun T. Smith, holding an object on fire—commonly known as a Molotov cocktail. Officer Lee then saw Smith throw the Molotov cocktail into the store.

13.     Smith and the others then fled on foot and continued running despite Officer Lee's orders to stop. Smith finally tripped and fell, at which point Officer Lee pulled out his taser and ordered him not to move. Officer Austin Domagalski then handcuffed Smith. While still on the ground, Smith told the officers that he had a gun in his right pocket. Officer Domagalski recovered a loaded firearm from Smith's front right pants pocket.

14.     Back at the Boost Mobile store, Officer Matthew Link observed that the Molotov cocktail was actively burning next to a display case. Officer Link crawled under the metal security gate and extinguished the fire with a fire extinguisher. Officer Link observed that the Molotov cocktail's clear glass bottle contained a liquid with a fabric cloth in the mouth of the bottle.

15.     Police later recovered the Molotov cocktail—made out of an Everfresh Tropical Fruit Punch glass bottle and a white towel with burned ends soaked in gasoline—from the store. Police also took a black hooded sweatshirt and black gloves, which were coated in gasoline, from Smith's person. Detective Steven Jegen noted that the white towel, the black hooded sweatshirt, and the black gloves all had an odor of gasoline. An officer also recovered a red

4

Apple iPhone from Smith's right pants pocket, and the defendant told the police that his phone number is 224-249-0379.

16.     The next day, Officer Shaletta Whiters interviewed Smith.  After waiving his rights, Smith said that he was looking on Facebook and observed riots taking place in the Milwaukee area. He implied that he viewed Facebook while he was out in public. He became enraged and felt like he needed to do something about it. He walked down 27th Street until he arrived at the cell phone store with a Molotov cocktail in hand. Smith admitted that he threw the Molotov cocktail through the window of the store, and said that he ran when he saw the police officers approaching, until he tripped on the sidewalk. Smith also admitted that he had a gun—a black Taurus PT709 Slim 9mm pistol—concealed in his right pocket. Smith said that he decided to throw the Molotov cocktail, because he wanted to stand for something.

17.     Later that day, I interviewed the Smith, along with Special Agent Jody Keeku. The defendant stated in substance that he walking home from a woman's house when the incident occurred. He also said that he was still intoxicated when he went out to do some "stupid shit." The defendant suggested that the store's window was already broken when he walked up. He claimed that he found the bottle, which he described as an Everfresh glass juice bottle, on the sidewalk down the street from the incident location, along with 6 or 7 other bottles. He said that the bottle did not have liquid in it, because the towel soaked it all up. The defendant said that he ignited the towel with one swipe of a cigarette lighter, because the towel was soaked in gasoline. But, he claimed that he did not throw the Molotov cocktail at the store; he just threw it down because he saw the police as soon as he lit the towel.

18.     The defendant told me that there were several other people out there and at least four people had Molotov cocktails, but claims that he did not know the other people. He implied

5

that he was simply following along. The defendant said that he was the only one who got caught. The defendant said that he had his phone on him when he arrested, that his phone was in his pocket the whole time, and that he was just listening to music on his phone.[1]

19.     During that interview, the defendant stated that his phone number was 224-249-0379. (I have since conducted a records search for phone number 224-249-0379, which reveals that the service provider is AT&T and the subscriber is the defendant's fiancé Vernisha Ashby.)

20.     Based on my training and experience, I know that the ATF's Explosives Enforcement Branch has previously determined that a Molotov cocktail, consisting of a glass bottle filled with a quantity of ignitable liquid and an improvised wick inserted into the neck of the bottle as an ignition device, is properly identified as an "incendiary bomb" and is a "destructive device" as that term is defined in Title 26, United States Code, Section 5845(f). I also know that a "destructive device" is a firearm subject to the National Firearms Act.

21.     Based on my review of the descriptions and photographs, I believe that the Molotov cocktail used by Smith is a "destructive device" as that term is defined in Title 26, United States Code, Section 5845(f), and, therefore, a firearm made in violation of the National Firearms Act. A towel was inserted into the glass bottle with half of the towel sticking out of the mouth of the bottle, and the half sticking out appeared to have burn marks. The bottle and towel were lying on its side, and the ground beneath the towel appeared to be wet.

_____

[1] The defendant's red Apple iPhone (IMEI 356447105106945) is currently in the lawful possession of the ATF and was taken from the defendant's person in a search incident to a lawful arrest. By separate application, the Government seeks to examine and extract the electronically stored information on that phone for evidence of the above referenced crimes.

6

22.     There is evidence of other people involved in the criminal activities in and around the Boost Mobile store at the time of the incident. Surveillance videos captured another person break the window of the Boost Mobile store shortly before the defendant threw the Molotov cocktail, and captured another person or persons fleeing when the police arrive.

23.     I have conducted a search of public profiles on Facebook and located Facebook profile "Taytown Wudaegang," which was "friends" with the profile of the defendant's fiancé Vernisha Ashby. In the hours before the incident on Sunday, May 31, 2020, Facebook profile "Taytown Wudaegang," which belongs to the defendant, posted the following:





24. That Facebook profile also contained several photos, which had been posted to Facebook and appeared to have been taken on an electronic device, such as the target cellphone's digital camera. I reviewed multiple photos posted on Facebook profile "Taytown Wudaegang," which appear to depict the defendant holding multiple different firearms. Those photographs are

8

also consistent with the Facebook profile photograph, which appears to depict the defendant in a facemask holding a gun.

25. On June 9, 2020, this Court released the defendant on conditions. In light of that, the defendant now has the ability to access, control, and use the Facebook profile "Taytown Wudaegang."

26. Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

27. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

28. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

9

29.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

30.     Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

31.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video.  It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video.  When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video.  For Facebook's purposes, the photos and videos associated with a

10

user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

32.     Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

33.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

34.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

35.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

36.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

37.     Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

38.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

39.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

40.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

41.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal

12

conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

13

42.     A preservation request was submitted to Facebook for information associated with the target account on June 5, 2020. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

### INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

43.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

### CONCLUSION

44.     Based on the foregoing, I request that the Court issue the proposed search warrant. The information and records sought are also likely to corroborate information and records sought from AT&T and electronically stored information on a red Apple iPhone (IMEI 356447105106945), which the Government seeks in separate applications.

45.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.  The government will execute this warrant by serving it on Facebook.  Because the warrant will be served on Facebook, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

14

46.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the Facebook User ID 100005159586637 (Facebook Profile: "Taytown Wudaegang"), that is stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California.

## ATTACHMENT B

### Particular Things to be Seized

**I.      Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)     All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers;

(b)     All activity logs for the account and all other documents showing the user's posts and other Facebook activities from May 1, 2020 to June 12, 2020;

(c)     All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them from May 1, 2020 to June 12, 2020, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)     All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification

numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)     All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(f)     All other records and contents of communications and messages made or received by the user from May 1, 2020 to June 12, 2020, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g)     All "check ins" and other location information;

(h)     All IP logs, including all records of the IP addresses that logged into the account;

(i)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j)     All information about the Facebook pages that the account is or was a "fan" of;

(k)     All past and present lists of friends created by the account;

(l)     All records of Facebook searches performed by the account from May 1, 2020 to June 12, 2020;

(m)     All information about the user's access and use of Facebook Marketplace;

(n)     The types of service utilized by the user;

2

(o)     The length of service (including start date) and the means and source of any

        payments associated with the service (including any credit card or bank account

        number);

(p)     All privacy settings and other account settings, including privacy settings for

        individual Facebook posts and activities, and all records showing which Facebook

        users have been blocked by the account;

(q)     All records pertaining to communications between Facebook and any person

        regarding the user or the user's Facebook account, including contacts with support

        services and records of actions taken.

Facebook is hereby ordered to disclose the above information to the government within

**14 DAYS** of issuance of this warrant.

3

## II.    Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of attempted arson of property used in and affecting interstate commerce, in violation of Title 18, United States Code, Section 844(i), possession of a firearm, a destructive device, made in violation of the National Firearms Act (NFA), in violation of Title 26, United States Code, Sections 5861(c), 5845(a), and 5845(f), conspiracy to commit arson, in violation of Title 18, United States Code, Sections 844(n) and 844(i), and evidence of aiding and abetting those crimes, in violation of Title 18, United States Code, Section 2, have been committed by Tyshaun Smith and unknown persons since May 1, 2020, including, for each user ID identified on Attachment A, information pertaining to the following matters:

(a)  Information about the protests, riots, and civil unrest in the Milwaukee area occurring between May 25, 2020 and June 1, 2020;

(b)  Communications between Tyshaun Smith and others;

(c)  Any information about Tyshaun Smith's location or whereabouts on or about Sunday, May 31, 2020;

(d)  Any information about accelerants or ignitable liquids (such as gasoline, kerosene, or other petroleum distillates), glass bottles, ignition devices (such as an improvised wick or towel), heat sources, and ignition sources (such as a lighter or matches);

(e)  Any information about making, receiving, possessing, or using an improvised incendiary bomb or destructive device, commonly known as a Molotov cocktail;

(f)  Any information about the custody, control, ownership, and use of a red Apple iPhone (IMEI 356447105106945);

4

(g) Any information about the Boost Mobile, located at 949 North 27th Street, Milwaukee, Wisconsin 53208;

(h) Any information related to the use, possession, custody, or control of the phone number 224-249-0379;

(i) Any information about the appearance, clothing, and identity of Tyshaun Smith and others;

(j) Any information about the existence, scope, or overt acts in furtherance of a conspiracy;

(k) Any information related to motive, intent, or knowledge of the violations described above;

(l) Any information related to the concealment or destruction of evidence of the violations described above;

(m) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(n) Evidence indicating the Facebook account owner's state of mind as it relates to the crimes under investigation;

(o) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the ATF may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

Case 2:20-mj-00317-SCD   Filed 06/15/20   Page 23 of 23   Document 1